UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
--------------------------------x
DIEUSAUVEUR MATHIEU,            :
                               :
          Plaintiff,           :
                               :
v.                             :    CASE NO. 3:08CV01317(AWT)
                               :
WHOLE FOODS MARKET GROUP, INC.,:
                               :
          Defendant.           :
--------------------------------x
```

<u>**RULING ON MOTION FOR SUMMARY JUDGMENT**</u>

The plaintiff, Dieusauveur Mathieu ("Mathieu"), brings this action against the defendant, Whole Foods Market Group, Inc.  His remaining claims are for employment discrimination based on race and national origin and for negligent supervision.  Count Two of the complaint sets forth a claim for race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").  Count Three sets forth a claim for negligent supervision.  Count Five is brought pursuant to 42 U.S.C. § 1981.  The defendant has moved for summary judgment on these remaining three counts.  For the reasons set forth below, the defendant's motion is being granted.

**I.   FACTUAL BACKGROUND**

Mathieu is a black male, whose country of origin is Haiti.  He was hired by the defendant in September 2004.  Mathieu worked in the defendant's Everett, Massachusetts location, as a selector, making $12.50 an hour.  Mathieu's responsibilities as a

selector consisted of picking product from a list of items given to him by the defendant.  Within the defendant's organizational structure, Team Members reported to Trainers, who reported to Associate Team Leaders (ATLs), who reported to Team Leaders, who reported to Managerial-Type Team Leaders.  Selectors fell within the category of Team Member.

When Frank Weiner, Mathieu's supervisor, was relocating to the defendant's location in Cheshire, Connecticut, he asked Mathieu whether he was interested in changing locations.  In November 2005, Mathieu's request to transfer to Cheshire was approved by Jim Doyle, the Associate Facility Team Leader of the Cheshire Distribution Center.

In February 2006, Mathieu applied to be a Trainer and was promoted to that position by Doyle.  His responsibilities as a Trainer consisted of being responsible for training Team Members, working in both the refrigerated and warm parts of the warehouse, operating the powered pallet jacks and forklifts, operating dock plates and dock logs and warehouse loading bay doors, general cleaning, identifying pallets that needed to be restocked and loading such pallets, and loading trucks and recording what had been loaded into a computerized warehouse management system.

Shortly thereafter, in July 2006, Mathieu was promoted by Doyle to the position of Associate Team Leader (ATL).  As an ATL, his responsibilities were to assist the Team Leader in performing

all functions necessary to properly lead the shipping and
receiving team, including overseeing receiving, order selection,
forklift operation, maintenance, and training, and supporting
warehouse team members.  At any given time, Mathieu was
supervised by one of the following Team Leaders: Weiner, Brain
McBrayer, Frank Napoli, and Kirk Neal.  Mathieu got along with
all his supervisors, except Neal, who was extremely rude and
unfriendly to Mathieu.  Neal worked as a Team Leader in the
defendant's Cheshire location for a few months during 2007.  By
August 30, 2007, Neal was no longer at the Cheshire location.

Prior to Neal's departure, he referred to Mathieu as
"Mathieu-Haiti" on different occasions.  Mathieu was offended by
the name because it was not his formal name.  In addition, on one
occasion, while Mathieu was using a computer, Neal told Mathieu:
"Get off the computer. Go find another one."  Mathieu felt he was
being kicked off the computer, but complied with Neal's request
because Neal was his boss.  Mathieu told Weiner about Neal's use
of the name "Mathieu-Haiti" and the computer incident, and Weiner
discussed both situations with Neal.  Thereafter, Neal relocated
to another of the defendant's locations.  No one other than Neal
made any comments that Mathieu viewed as discriminatory.  Mathieu
felt that Neal's behavior in kicking him off the computer and
calling him "Mathieu-Haiti" was discriminatory.

A job/personal change sheet, dated December 18, 2006,

reflected that Mathieu's supervisor, Weiner, commented in the "steps for improvement" section that Mathieu needed to work on his temper and on being professional.  It also reflected Weiner's view that Mathieu needed to learn more about handling computer orders, breaking down orders, counseling, and sitting in on interviews.  It reflected further, in the section on areas for development, that Mathieu had to work on his temper, computer orders, clerical knowledge, and leadership tasks.

An August 13, 2007 job/personal change sheet reflected that Weiner noted as "steps for improvement" that Mathieu had to realize that Mathieu's input was needed when dealing with future goals and ideas for the company, and that Mathieu needed to work on being more creative.

In September 2007, a Team Leader position became available. The opening was announced at a meeting and interested applicants were instructed to submit a plan outlining the actions they would take if they were promoted to Team Leader.  Weiner encouraged Mathieu to apply.  Mathieu applied, in addition to Matthew Gendron, an ATL who is white, and a third candidate from one of the defendant's other locations.  While Gendron had previously applied to be a Team Leader, this was Mathieu's first time applying.  On September 13, 2007, Mathieu interviewed for the Team Leader position.  The interviewers were Doyle, Eti Sejdic, who was an Operations Team Leader, Weiner, Napoli, Carmen

LaGaipa, who was an ATL, and Domenic Harriott, who was a Team Member who worked as a selector.  Harriott was the only non-white interviewer.  Mathieu concedes that Neal was not involved in the interview and was not a decision maker.

Doyle felt that Mathieu's interview was disjointed and unimpressive.  Doyle felt Mathieu's "unusual responses indicated that he was not ready to move into the position of Team Leader, as they were unclear, not necessarily responsive to the questions asked, and at times not appropriate."  (James Doyle Affidavit (Doc. No. 37)("Doyle Aff.") ¶ 15.)  In particular, Doyle felt that Mathieu's comment that a good leader would be "nice and a jerk" raised concerns about his qualifications for the position and that such a style of leadership did not fit the defendant's culture.  <u>Id.</u>, ¶ 16.  Mathieu testified that he stated that a good leader should be "nice and mean" and that "mean" is "I tell you to do something nicely and then that's serious." (Dieusauveur Mathieu Deposition, June 2, 2009 (Doc. No. 41) ("Pl. Dep.") 180:4-181:15.)

With respect to employee theft, Mathieu testified that he stated that employee theft was a problem and that if he was promoted to Team Leader he would tell ATLs to stop the theft. Doyle felt that when asked "what was stopping him from preventing employee theft as an ATL, Mr. Mathieu could not give a good answer as to why he, as an ATL, was not doing what he would

instruct ATLs to do if he was a Team Leader." Doyle Aff. ¶ 19.

Doyle was concerned that Mathieu had not been taking the initiative to develop the "skills and behaviors necessary" to be promoted to Team Leader. Id., ¶ 21. Doyle expressed his view that Mathieu's comments made it clear that Mathieu was not performing several of his responsibilities as an ATL. In contrast, Doyle felt Gendron's interview went very well and that Gendron clearly outlined Gendron's ideas regarding actions he would take if promoted to Team Leader. Doyle felt that Gendron had taken the initiative to learn the skills needed to be a successful Team Leader.

Less than two weeks after Mathieu's interview, Mathieu learned from George Genovese, an ATL, that Gendron, not Mathieu, had been promoted to Team Leader. On or about September 25, 2007, Mathieu met with Sejdic about a shift that he was called to work on when Larry Villaba, an ATL, unexpectedly worked a few hours on that same shift. Mathieu testified that Weiner had alerted him to watch out for Villaba, who was Sejdic's and Gendron's buddy, and that he believed that Villaba was watching him and scrutinizing him. Genovese, Villaba, and Napoli were also in attendance at the meeting. During the meeting, Mathieu got into an argument with Genovese, and asserted that Villaba should "well, be a man" and "stay behind what you say." Pl. Dep. 207:1-14. In an email summarizing the meeting, Sejdic stated

that Matheiu, Genovese and Villaba had interpersonal issues, which was reflected in their conduct in the presence of Team Members during their shift, and this constituted setting a bad example for the team. Sejdic stated that all of them needed to work on their interpersonal skills and their work relationships. Sejdic noted that Genovese and Villaba expressed to Mathieu that they did not appreciate the way Mathieu spoke to them, and Mathieu became defensive. Sejdic told Mathieu that it was unacceptable for him to talk to Villaba in that manner, and at some point during the meeting Sejdic walked out during a discussion. The meeting ending shortly thereafter.

Mathieu testified that he did not have a chance to explain at that meeting that he felt he should have gotten the promotion to Team Leader and that he felt he did not get the promotion because of his race or national origin.

Mathieu testified that, at some point thereafter, he had a meeting with Doyle, Sejdic and Weiner about the Team Leader position. Mathieu testified that he did not recall what occurred at the meeting, nor what he said or what was said to him at the meeting, but that he did recall discussing the Team Leader position. The defendant has produced evidence that the purpose of the second meeting, which was held on or about September 28, 2007, was to discuss Mathieu's frustrations with his Team Members. However, the defendant agrees that, at this second

meeting, Mathieu complained to Sejdic that he should have received the promotion because he had more experience than Gendron.

Mathieu testified that Sejdic was no longer friendly with him after these two meetings, the second of which occurred two weeks prior to the date on which he contends he was constructively discharged by the defendant. Mathieu points only to abrupt and unfriendly behavior on the part of Sejdic, and to no act by any other employee, in support of his claim that the defendant retaliated against him after the second meeting.

On October 2, 2007, Mathieu submitted a vacation request for four days off starting on October 16, 2007. He then changed his request and asked for an extended vacation for three weeks. Mathieu admits that he planned on leaving the defendant's employ when he requested vacation time. On October 9, 2007, Mathieu applied for a job at Domino's Pizza. On the Domino's Pizza application, Mathieu indicated that he was employed by the defendant. He listed his employer as "Whole Foods" and in response to the question "Reason for leaving", he answered "still there."[1]  (Tanya Bovee Affidavit (Doc. No. 35) Ex. 13.)  On

---

[1]Mathieu attempts to dispute the accuracy of the Domino's Pizza application, but admits that prior to leaving the defendant's employ on October 12, 2007, he spoke to Mark Knibbs, a former employee of the defendant who worked as Team Leader at Domino's Pizza, and that he told Knibbs, "I'm leaving. I want to leave Whole Foods," and that Knibbs offered him a job.  Pl. Dep. 233:3-8.

October 11, 2007, Mathieu amended his vacation request and asked for an additional three weeks, although he did not expect to receive it.  Mathieu testified that he requested all his vacation time because he was not going back to work for the defendant due to the way management had treated him.

On October 12, 2007, Mathieu approached Weiner and requested a meeting with Sejdic.  The same day, Mathieu, Weiner, Sejdic and Gendron met.  Mathieu testified that Sejdic would not reveal who had gotten the Team Leader position.  At the meeting, Mathieu signed a "team member separation form" in which he voluntarily resigned without notice, and he immediately stopped working for the defendant.  Mathieu testified that he resigned because the defendant had harassed and discriminated against him.  He further testified that at the meeting he suspected that Gendron had been promoted to the Team Leader position because Gendron signed as a witness on the "team member separation form."  At the time of his resignation, Mathieu's pay rate was $19.15 per hour.  On October 22, 2007, Mathieu started working at Domino's Pizza as an ATL, with a salary of $19.35 per hour.

Mathieu testified that he felt he was discriminated against because someone who had less experience than him was promoted to Team Leader.  He testified further that he was retaliated against by all of management, but this was based only on Sejdic's behavior towards him during and after the two meetings.  Mathieu

-9-

testified that he felt the Team Leader position was his because he had the experience for it, and he did not know why he was not promoted to the position.  Mathieu also testified that he felt Gendron was not qualified for the position because, in addition to Gendron not working for the defendant long enough, Gendron did not have experience comparable to Mathieu's.  However, Mathieu admits that a Team Leader needed more than just experience, and that successful candidates needed to have computer, organizational, motivational, and communication skills, and be safety minded, team players, self-starters, and problem solvers.

Mathieu testified about hearsay statements to him by two co-workers to the effect that he would not, and he did not, get the Team Leader position because of his race and/or national origin. Howvever, Mathieu concedes that non-white employees had leadership roles at the defendant's Cheshire location, and he testified that, in 2007, Levon Johnson, who is black, was a Team Leader working at the defendant's Cheshire location.

## II.  STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22

F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  See Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  Anderson, 477 U.S. at 255.  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment.  An issue is "genuine
. . . if the evidence is such that a reasonable jury could return
a verdict for the nonmoving party."  Anderson, 477 U.S. at 248
(internal quotation marks omitted).  A material fact is one that
would "affect the outcome of the suit under the governing law."
Id.  As the Court observed in Anderson: "[T]he materiality
determination rests on the substantive law, [and] it is the
substantive law's identification of which facts are critical and
which facts are irrelevant that governs."  Id.  Thus, only those
facts that must be decided in order to resolve a claim or defense
will prevent summary judgment from being granted.  When
confronted with an asserted factual dispute, the court must
examine the elements of the claims and defenses at issue on the
motion to determine whether a resolution of that dispute could
affect the disposition of any of those claims or defenses.
Immaterial or minor facts will not prevent summary judgment.  See
Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

     When reviewing the evidence on a motion for summary
judgment, the court must "assess the record in the light most
favorable to the non-movant and . . . draw all reasonable
inferences in [its] favor."  Weinstock v. Columbia Univ., 224
F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v.
Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because
credibility is not an issue on summary judgment, the nonmovant's

evidence must be accepted as true for purposes of the motion.
Nonetheless, the inferences drawn in favor of the nonmovant must
be supported by the evidence.  "[M]ere speculation and conjecture
is insufficient to defeat a motion for summary judgment." Stern
v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997)
(quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118,
121 (2d. Cir. 1990)).  Moreover, the "mere existence of a
scintilla of evidence in support of the [nonmovant's] position
will be insufficient; there must be evidence on which [a] jury
could reasonably find for the [nonmovant]." Anderson, 477 U.S.
at 252.

     Finally, the nonmoving party cannot simply rest on the
allegations in its pleadings since the essence of summary
judgment is to go beyond the pleadings to determine if a genuine
issue of material fact exists.  See Celotex Corp., 477 U.S. at
324.  "Although the moving party bears the initial burden of
establishing that there are no genuine issues of material fact,"
Weinstock, 224 F.3d at 41, if the movant demonstrates an absence
of such issues, a limited burden of production shifts to the
nonmovant, which must "demonstrate more than some metaphysical
doubt as to the material facts, . . . [and] must come forward
with specific facts showing that there is a genuine issue for
trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067,
1072 (2d Cir. 1993)(quotation marks, citations and emphasis

-13-

omitted).  Furthermore, "unsupported allegations do not create a material issue of fact."  Weinstock, 224 F.3d at 41.  If the nonmovant fails to meet this burden, summary judgment should be granted.

### III.  DISCUSSION

#### A.    Claims Under Title VII and Section 1981

Mathieu makes claims pursuant to Title VII and 42 U.S.C. § 1981 for race and national origin discrimination and retaliation.  To establish a claim under § 1981, a plaintiff must establish each of "the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)."  Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).  A plaintiff may establish that this right was interfered with by demonstrating that a hostile work environment existed or that he suffered an adverse employment action, such as a termination or demotion.  Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir.2000).  See also Gen. Bldg. Contractors Ass'n Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982)(§ 1981 "can be violated only by purposeful discrimination.").

In order to survive a motion for summary judgment on a Title

VII claim of intentional discrimination, a plaintiff must establish the elements of a prima facie case.  "[T]his burden [is] 'de minimis:' it is 'neither onerous, nor intended to be rigid, mechanized or ritualistic.'"  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d. Cir. 2008).  "To meet this burden, a plaintiff must show: (i) membership in a protected class; (ii) qualifications for the position; (iii) an adverse employment action; and (iv) circumstances surrounding that action giving rise to an inference of discrimination."  Collins v. New York City Transit Authority, 305 F.3d 113, 118 (2d Cir. 2002).  These elements, although sometimes presented in different language, have been held to be the same as those required to state a claim for employment discrimination under § 1981.  See Choudhury v. Polytechnic Inst. of N.Y., 735 F.2d 38, 44 (1984) ("the same elements constitute a claim for employment discrimination under § 1981 as under Title VII").

If the plaintiff meets his burden, then the defendant has the burden to produce a non-discriminatory, legitimate reason for the employment decision "to defeat a rebuttable presumption of discrimination."  Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001).  It is not necessary for the defendant to convince the court that the proffered reasons actually motivated it.  Texas Dep't. of Comty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); see also Meiri v. Dacon, 759

F.2d 989, 996 n.11 (2d Cir. 1985).  "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Burdine, 450 U.S. at 253).  Therefore, the plaintiff must be given the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Id. (quoting Burdine, 450 U.S. at 253).

Mathieu argues that he was denied the promotion to Team Leader because of his race and/or national origin and thereafter complained that he was denied the promotion because of his race and/or national origin.  He further argues that the defendant, in retaliation for the complaints made, created a hostile work environment that forced him to resign.

Mathieu has not established a <u>prima facie</u> case because he has failed to produce evidence that his failure to be promoted gave rise to an inference of discrimination due to race or national origin.  The only evidence that he has produced of any of the defendant's employees being biased due to race and/or national origin was with respect to Kirk Neal.  However, Neal was not involved with the Team Leader promotion interview or its decision making process and, in fact, Neal was not employed at the Cheshire facility at the time the Team Leader position became

available and Mathieu applied.  The evidence does not reflect that any other employee of the defendant did anything that suggested a bias against Mathieu on the basis of his race and/or national origin.

Mathieu testified to having seen several job/personal change sheets, containing suggestions for work-related improvements for him.  In particular, on a December 18, 2006 job/personal change sheet, Weiner commented that "Mathieu needs to work on his temper at times.  As a leader, he needs to be professional at all times."  Pl. Dep. at 98:16-20.  Mathieu testified that Weiner spoke to him about speaking professionally to others.  In addition, Weiner commented that Mathieu needed to learn more on "EXE," which Mathieu testified meant entering computer orders. Furthermore, Weiner identified areas for development, including temper, EXE, clerical knowledge and leadership tasks.

Doyle, a member of the interview team, had promoted Mathieu in 2006 to Trainer and to ATL.  Weiner, another member of the interview team, had suggested to Mathieu that Mathieu join Weiner when he moved from Everett to Cheshire, and had encouraged Mathieu to apply for the Team Leader position.  Although Mathieu disagrees with Doyle's assessment of his performance during the interview, Mathieu does not produce evidence that could support a conclusion that Doyle's assessment was anything other than his honest reaction.  Mathieu's testimony during his deposition is

entirely consistent with Doyle's statements regarding the
interview.  Doyle averred that he was concerned that Mathieu was
not performing his duties as an ATL.  Mathieu testified that
during his interview the topic of theft was raised, and that one
of the interview panel members asked him why he was not currently
preventing theft as an ATL.  Doyle averred that he felt that
Mathieu's comment that a good leader would be "nice and a jerk"
raised concerns about his qualifications for the Team Leader
position and that such a style of leadership did not fit the
defendant's culture.  Mathieu's testimony confirmed that he made
that statement.

Moreover, assuming arguendo that the plaintiff had
established a prima facie case, the plaintiff has not produced
evidence that could support a conclusion that the defendant's
proffered reason for not promoting the plaintiff was a pretext
for discrimination based on either race or national origin.

In addition, Mathieu has not established a prima facie case
that the defendant retaliated against him because of complaints
he made about discrimination, because he failed to produce
evidence that could support a conclusion that he complained about
either race or national origin discrimination.  Mathieu argues
that he complained about discrimination on two occasions, both of
which were meetings he had with management after he learned that
he did not get the promotion.  However, during the first meeting,

Mathieu did not say anything about being discriminated against. As to the second meeting, it could only be shown that Mathieu complained that he should have received the promotion to Team Leader because he had more experience than Gendron and was therefore better qualified for the position.

Therefore, the court concludes that the plaintiff has failed to create a genuine issue with respect to material facts concerning his Title VII and §1981 claims of discrimination based on race and/or national origin and retaliation, and the defendant is entitled to summary judgment on each of these claims.

### B.   Negligent Supervision Claim

Although the defendant addressed this claim in its moving papers and met its initial burden, Mathieu failed to respond to the motion for summary judgment with respect to this claim. Therefore, the court deems this claim to be abandoned. See Ide v. WinWholesale, Inc., 596 F. Supp. 2d 249, 254-55 (D. Conn. 2009).

In any event, in connection with a negligent supervision claim, a "plaintiff must plead and prove that [he] suffered an injury due to the defendant's failure to supervise an employee whom the defendant had duty to supervise." Roberts v. Circuit-Wise, Inc., 142 F. Supp. 2d 211, 214 (D. Conn. 2001). The only evidence in the record is that when Mathieu and another employee were having a problem, the defendant responded.  When

Neal "kicked" Mathieu off a computer and called him "Mathieu-Haiti," Mathieu complained to his supervisor, Weiner, who then spoke to Neal about the problem.  When Mathieu was having problems with Villaba, Sejdic held a meeting at which interpersonal issues between Mathieu, Villaba and Genovese were addressed.

Therefore, the court concludes that the defendant is also entitled to summary judgment on the plaintiff's negligent supervision claim.

## IV.  CONCLUSION

For the reasons set forth above, the defendant's Motion for Summary Judgment (Doc. No. 33) is hereby GRANTED.  The Clerk shall enter judgment in favor of the defendant and close this case.

It is so ordered.

Signed this 15th day of March, 2010 at Hartford, Connecticut.

_____
                /s/AWT
           Alvin W. Thompson
     United States District Judge